579 F.2d 1192
 Mary Jane MARTIN, Plaintiff-Appellant,
v.
HARRAH INDEPENDENT SCHOOL DISTRICT, L. M. Sullivan, Edward
Brzozowski, Walter Helm, Loyd Mixon, Harold
Manwell, Joe Zawiska, and Paul Thomas,
Defendants-Appellees.
 No. 76-1813.
 United States Court of Appeals,
Tenth Circuit.
 Argued Dec. 12, 1977.
Decided June 30, 1978.
Rehearing Denied Aug. 8, 1978.
 
 Robert Chanin, Washington, D. C. (Robert Weinberg and Jeremiah A. Collins of Bredhoff, Cushman, Gottesman & Cohen, and David Rubin, National Education Association, Washington, D. C., on briefs), for plaintiff-appellant.
 Ronald L. Day of Fenton, Fenton, Smith, Reneau & Moon, Oklahoma City, Okl. (Larry L. French of Edwards & French, Seminole, Okl., with him on the brief), for defendants-appellees.
 Before SETH, Chief Judge, and McWILLIAMS and McKAY, Circuit Judges.
 McKAY, Circuit Judge.
 
 
 1
 Plaintiff was a tenured teacher. Oklahoma law required the defendant school board to renew her contract annually unless she was guilty of "immorality, wilful neglect of duty, cruelty, incompetency, teaching disloyalty to the American Constitutional system of government; or any reason involving moral turpitude." Okl.Stat., tit. 70, § 6-122 (Supp.1973) (repealed 1977). That statute also provided for full scale hearing and appellate procedures in the event of nonrenewal. Plaintiff's contract incorporated by reference the rules and regulations of the board. Of relevance to this case was a regulation requiring continuing education in specified increments. The regulation allowed three years in which to complete the work. Both by the terms of the regulation itself and by the uninterrupted practice of the board, the only sanction for noncompliance with this requirement was the withholding of salary increments. This rule remained in effect throughout the dispute and litigation below.
 
 
 2
 Plaintiff, for a variety of reasons including her heavy involvement in the school's extracurricular programs, exercised her option to forego salary increments during the 1972-1974 school years by not completing the specified additional credit hours of study. Her contract was renewed by defendant board without the increments. After the renewal of her contract for the 1973-1974 school year, the Oklahoma State Legislature mandated certain salary raises for teachers regardless of their compliance with the continuing education policy. Thus deprived of the only available sanction against four teachers, including plaintiff, who had been relying on their right to forgo salary increments, the board wrote to them on September 6, 1973, saying that unless they completed five semester hours by April 10, 1974, their contracts would not be renewed for 1974-1975. The reason given for the threatened nonrenewal was "gross neglect and failure to adhere to board policy." Oddly enough, the letter repeated the language of the regulation indicating that the penalty for continued noncompliance was denial of salary increments.
 
 
 3
 The board's letter implemented a special policy as to plaintiff and her three yokefellows under which they, unlike any other tenured teacher before or since, would be subject to discharge for failure to come into compliance with continuing education requirements within seven months (instead of three years). The only factor which distinguished this insular group from all other teachers, so far as the newly adopted policy of discharge for noncompliance was concerned, was the fact that they had lawfully relied on the board's prior policy of salary penalty only.
 
 
 4
 Plaintiff did not earn the five credits within the seven month period imposed on her.[1] She appeared before the board in January 1974 to protest the proposed special limitation and penalty and to indicate that under the circumstances she could not and would not comply. At the April 1974 meeting the board voted not to renew plaintiff's contract for the 1974-1975 school year. Plaintiff immediately commenced both an administrative appeal and an action in the Oklahoma State courts. She lost at the first level of her administrative appeal and did not pursue additional steps available under Oklahoma administrative review laws.
 
 
 5
 The state trial court subsequently entered an order reinstating plaintiff and issued a writ of mandamus.[2] The Oklahoma Court of Appeals affirmed the issuance of the writ.[3] The Oklahoma Supreme Court did not reach the merits of the case, holding instead that the trial court was without jurisdiction to issue the writ of mandamus because plaintiff had failed to exhaust her administrative remedies. Martin v. Harrah Independent School Dist., 543 P.2d 1370 (Okl.1975). In a strongly worded dissent, three justices upheld the jurisdiction of the trial court and addressed the merits:
 
 
 6
 A teacher is a government employee and his interest in his continued employment is a protectible "property interest" and therefore, any termination is subject to procedural and substantive safeguards. . . . Being fired for willful neglect of duty places a stigma on Mary Jane and this too could be an infringement of "liberty and hence due process." . . .
 
 
 7
 . . . Non-renewal provisions being penal in nature must give fair warning of the exact conduct which is outlawed. Rules must be reasonable. This is the essence of substantive due process. Otherwise, a school board could arbitrarily add new rules and new penalties to the regulations already existing at the time the teacher's contract was signed, and then use a teacher's failure to conform to these as a basis for termination and call it "willful neglect of duty."
 
 
 8
 Id. at 1378 (Doolin, J., dissenting).
 
 
 9
 Because of the mandamus order of the Oklahoma trial court, plaintiff remained on the job until January 1975. By that time she had earned the required five academic credits and, in the eyes of the board, was in full compliance with the continuing education policy. After the Oklahoma Supreme Court decision, the parties attempted a settlement. When plaintiff refused the board's offer they voted to terminate her contract "pursuant to the decision of the Oklahoma State Supreme Court."
 
 
 10
 Following her termination, plaintiff immediately filed this action in federal district court[4] alleging that she had been denied equal protection under the laws and had been deprived of protected liberty and property interests without due process of law. Her motion for a preliminary injunction was denied and, by stipulation, the district court decided the issue of liability on the basis of evidence presented at the hearing on the preliminary injunction. The trial court properly declined to assert pendent jurisdiction over the non-Federal question of whether noncompliance with the continuing education policy amounted to "wilful neglect of duty" as contemplated by the Oklahoma statute. This question was clearly one of state law on which the Oklahoma courts had not spoken.
 
 
 11
 The only constitutional issue addressed by the district court was whether plaintiff's nonrenewal was based on an "impermissible reason that is prohibited by the Constitution." The court found no impermissible or irrational classification in the continuing education rule and therefore held there had been no denial of equal protection. While recognizing that plaintiff "was a tenured teacher and as such had a protected 'property' interest in continued employment," the trial court nevertheless concluded that by complying fully with the state procedural requirements relating to hearings in cases of contract nonrenewal, the board had satisfied the procedural due process requirements of the Fourteenth Amendment. As to plaintiff's claim that she was denied fair warning that her contract could be nonrenewed if she did not continue her education, the court held that "notice in the due process sense seems to intend notice of the proceedings against the plaintiff, not notice of all possible penalties that may be imposed for violation of certain rules and regulations." Finding that plaintiff was "afforded her full constitutional rights," the court entered judgment on behalf of the board and dismissed her complaint.
 
 
 12
 It is plaintiff's contention on appeal that the board's nonrenewal of her contract was a deprivation of property and liberty without due process of law. That claim is bottomed on an arbitrary rule change which gave a small class of teachers, whose only sin was lawful reliance on the board's long-standing rules, only seven months to avoid the new sanction of contract nonrenewal while giving all others similarly situated three years in which to comply. We recognize that "it may be difficult, if not impossible, to give to the term 'due process of law' a definition which will embrace every permissible exertion of power affecting private rights, and exclude such as are forbidden." Dent v. West Virginia, 129 U.S. 114, 123, 9 S.Ct. 231, 234, 32 L.Ed. 623 (1889). These terms "come to us from the law of England . . . and their requirement was there designed to secure the subject against the arbitrary action of the crown, and place him under the protection of the law." Id. "In this country the requirement is intended to have a similar effect . . . that is, to secure the citizen against any arbitrary deprivation of his rights, whether relating to his life, his liberty, or his property." Id. at 124, 9 S.Ct. at 234. In like manner, "(w)hen we consider the nature and the theory of our institutions of government . . . we are constrained to conclude that they do not mean to leave room for the play and action of purely personal and arbitrary power." Yick Wo v. Hopkins, 118 U.S. 356, 369-70, 6 S.Ct. 1064, 1071, 30 L.Ed. 220 (1886). More recent decisions reiterate that the "essence" or "touchstone" of the Due Process Clause is protection of the individual from arbitrary government action. See, e. g., Wolff v. McDonnell, 418 U.S. 539, 558, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); Slochower v. Board of Educ., 350 U.S. 551, 559, 76 S.Ct. 637, 100 L.Ed. 692 (1956); Ohio Bell Tel. Co. v. Public Utils. Comm'n, 301 U.S. 292, 302, 57 S.Ct. 724, 81 L.Ed. 1093 (1937).
 
 
 13
 While protection from arbitrary government action is broadly guaranteed under the general, umbrella concept of "due process of law," modern opinions typically look to other more specific provisions of the Constitution for the meaning they read into this almost amorphous phrase. For example, courts have often utilized the Fourteenth Amendment to impose the same restrictions on state action as were traditionally applied to federal action under the first eight amendments. See, e. g., Duncan v. Louisiana, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), and cases cited. From the specific constitutional provisions mentioned in the Bill of Rights, opinions have also interpolated protection against impairment of "fundamental interests." See, e. g., Carey v. Population Servs. Int'l, 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977); Planned Parenthood v. Danforth, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976); Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).
 
 
 14
 In addition to the specific and penumbra due process guarantees of the Bill of Rights, the Equal Protection Clause of the Fourteenth Amendment has been recognized as providing more specific constitutional safeguards under the due process umbrella. For example, in Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954), the Court employed the Fifth Amendment Due Process Clause to strike down school segregation in the District of Columbia just as it had used the Fourteenth Amendment Equal Protection Clause to invalidate similar state action in Brown v. Board of Educ., 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), decided the same day. In so doing, the Court explained:
 
 
 15
 (T)he concepts of equal protection and due process, both stemming from our American ideal of fairness, are not mutually exclusive. The "equal protection of the laws" is a more explicit safeguard of prohibited unfairness than "due process of law," and, therefore, we do not imply that the two are always interchangeable phrases. But, as this Court has recognized, discrimination may be so unjustifiable as to be violative of due process.
 
 
 16
 347 U.S. at 499, 74 S.Ct. at 694. Since the Fifth and Fourteenth Amendments "require the same type of analysis," Hampton v. Mow Sun Wong, 426 U.S. 88, 100, 96 S.Ct. 1895, 1904, 48 L.Ed.2d 495 (1976); See Buckley v. Valeo, 424 U.S. 1, 93, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), the Equal Protection Clause of the Fourteenth Amendment must be viewed merely as "a more explicit safeguard of prohibited unfairness" that is "additive" to the protection guaranteed by the Fourteenth Amendment Due Process Clause. See Hampton v. Mow Sun Wong, 426 U.S. at 100 n. 17, 96 S.Ct. 1895. It is, therefore, not surprising that in the same case some justices have employed an equal protection analysis while other justices have used a due process analysis to reach the same result under the Fourteenth Amendment. E. g., Cleveland Bd. of Educ. v. LaFleur, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974). Similarly, in Thompson v. Gallagher, 489 F.2d 443, 447 (5th Cir. 1973), the court observed:
 
 
 17
 Thompson attacked the ordinance on both equal protection and due process grounds. In many cases, of which this is one, it makes little difference which clause of the Fourteenth Amendment is used to test the statute in question. Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). The question is whether the challenged statute is a rational means of advancing a valid state interest. A regulation not reasonably related to a valid government interest may not stand in the face of a due process attack. Likewise, a classification which serves no rational purpose or which arbitrarily divides citizens into different classes and treats them differently violates the equal protection clause.
 
 
 18
 Not only does the Court apply due process and equal protection analyses in similar situations but it also applies additional and subclass analysis. These approaches variously have been labeled substantive due process, procedural due process, old equal protection, new equal protection or newer equal protection. The rise, and at least partial demise, of the "irrebuttable presumption" doctrine is one manifestation of various hybrid approaches to dealing with governmental unfairness. In Hampton, for example, the majority labeled its approach as equal protection. A dissenting opinion observed, however, that "while positing an equal protection problem, the Court does not rely on equal protection analysis. . . . The Court instead inexplicably melds together the concepts of equal protection and procedural and substantive due process." 426 U.S. at 119, 96 S.Ct. at 1913 (Rehnquist, J., dissenting). In like manner, one commentator has called the "irrebuttable presumption" technique the "New Old Equally Protective Substantively Procedural Due Process." See G. Gunther, Constitutional Law: Cases and Materials 893 n.8 (1976).
 
 
 19
 Regardless of the label attached or type of analysis pursued, the Fourteenth Amendment affords not only a procedural guarantee against the deprivation of life, liberty, and property but also protects substantive aspects of these interests against unconstitutional restrictions by the states. See Kelley v. Johnson, 425 U.S. 238, 244, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976). In each case the "essence" or "touchstone" of due process generally and equal protection specifically is protection of individuals from the arbitrary or unfair impact of government action. In each case the reviewing court must consider the constitutional importance of the affected individual interests, the character of the state action or classification in question and the state's asserted interests in support of its action or classification. As these factors vary from case to case, it is apparent that courts must of necessity apply a "spectrum of standards" in reviewing actions or classifications which allegedly violate the Due Process and Equal Protection Clauses.[5] We turn now to an examination of the importance of plaintiff's interests under the Constitution, the nature of the board's action in its decision not to renew plaintiff's contract and the asserted interests in support of the board's decision.
 
 
 20
 PLAINTIFF'S ALLEGED PROPERTY AND LIBERTY INTERESTS
 
 
 21
 The district court properly held that plaintiff's right to continued employment under her contract and Oklahoma tenure law was a property interest of constitutional importance. Property interests are not created by the Constitution, rather they are created and defined by state or federal statutes, local ordinances, and express or implied contract. Bishop v. Wood,426 U.S. 341, 344-45, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); Board of Regents v. Roth, 408 U.S. 564, 576-78, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); See Arnett v. Kennedy, 416 U.S. 134, 163, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974); Perry v. Sinderman, 408 U.S. 593, 599-603, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); Weathers v. West Yuma County School Dist., 530 F.2d 1335 (10th Cir. 1976); Abeyta v. Town of Taos, 499 F.2d 323, 327 (10th Cir. 1974). Plaintiff's contract with the board was guaranteed renewable. Okla.Stat., tit. 70, § 6-122 (Supp.1973) (repealed 1977). The statute constituted a promise of continued employment and was the kind of claim "upon which people rely in their daily lives, reliance that must not be arbitrarily undermined." Board of Regents v. Roth, 408 U.S. at 577, 92 S.Ct. at 2709. While not all property interests are protected by the Constitution, plaintiff's property interest as a tenured teacher is clearly in that class of interests for which the Court has recognized constitutional protection. See Perry v. Sinderman, 408 U.S. at 599-603, 92 S.Ct. 2694; Board of Regents v. Roth, 408 U.S. at 576-78, 92 S.Ct. 2701. We therefore agree with the trial court's determination that plaintiff has asserted the deprivation of a property interest having constitutional dimensions.[6]NATURE OF THE BOARD'S ACTION
 
 
 22
 In accordance with the board's prior admitted practices, a teacher's failure to comply with the continued education policy resulted in a denial of salary increments only. The board admitted that the imposition of the nonrenewal sanction was a change in its penalty for noncompliance. The record does not establish whether this substitution of penalty was peculiar to the insular group of four or was applied generally. We assume it applied to all teachers in the district, whether employed before or after the board gave notice of the new penalty. If nonrenewal were enforced against only plaintiff's insular group the board's action would be all the more objectionable.
 
 
 23
 The gravaman of the board's action was not the institution of a more severe penalty but the imposition of unequal time limitations within which teachers could avoid the penalty by compliance with the changed policy. By special letter, plaintiff's little group was ordered to acquire five academic credits within the following seven month period or face contract nonrenewal. In contrast, all other teachers had a three year period as allowed by the Unamended policies and guidelines of the board in which to acquire five credits. The only distinction between plaintiff's small group and all other teachers is that they had previously exercised their undisputed option to forego salary increments rather than acquire the suggested five hours additional credit. Their prior choices on this question were clearly within the scope of their contracts and existing board policy. Thus, plaintiff's former lawful conduct was the only basis for the board's decision to treat her differently from other teachers.
 
 
 24
 ASSERTED STATE INTERESTS IN SUPPORT OF THE BOARD'S ACTION
 
 
 25
 Plaintiff does not challenge the validity of the continuing education policy itself. We therefore need not inquire whether the continuing education policy is legitimated by the apparent state interest in providing competent, well-trained, and prepared teachers for students enrolled in its public schools. We also are not called upon to decide whether enforcement of that policy, and hence, furtherance of the state interest, may be accomplished generally by either a denial of salary increments or contract nonrenewal. We are asked to determine only whether there is a valid state interest in support of the board's decision requiring plaintiff to come into compliance within seven months as a condition of continued employment, while allowing other teachers three years in which to comply. The asserted state interest for this decision was the board's concern that plaintiff not go unpunished for her previous choices not to acquire additional credits. In light of her prior retention as a teacher despite her election not to continue her formal education it is clear plaintiff suffered nonrenewal not because she failed to obtain five additional academic credits but because the board could no longer deny her salary increments.
 
 DECISION
 
 26
 We hold that the board's decision not to renew plaintiff's contract was violative of the Fourteenth Amendment. As in Thompson v. Gallagher, 489 F.2d at 447, "it makes little difference which clause of the Fourteenth Amendment is used to test the (action) in question." In balancing the constitutional importance of plaintiff's property interest against the asserted state interests, we conclude that there is no rational basis for the board's action, whether viewed as an unreasonable classification or as arbitrary and capricious action.
 
 
 27
 The only justification for the board's disparate treatment of plaintiff's insular group of four was its inability to continue denial of salary increments as the penalty for past noncompliance with the continuing education policy. As previously discussed, plaintiff's prior elections to forego salary increments as an alternative to acquiring additional credits was entirely lawful under her contract, Oklahoma statutes and the written policies and regulations of the board. Inasmuch as her prior lawful conduct was made the basis for this disparate punitive treatment, the board's policy changes resemble a bill of attainder or ex post facto law, both of which are expressly prohibited by the Constitution because of their inherent unfairness. When her past lawful conduct is removed as a consideration, which indeed it must be, the board's action is without justification and is therefore arbitrary and capricious. Lacking a legitimate state interest in seeing that plaintiff is penalized by contract nonrenewal, the state has no apparent legitimate interest which could outweigh her constitutional interest in continued employment as a tenured teacher.
 
 
 28
 In summary, we believe plaintiff had a right to rely on the established board rules in considering her alternatives and that such reliance could not be arbitrarily undermined. Even if the requisite procedural due process notice and hearing requirements were strictly adhered to, the Fourteenth Amendment affords not only a procedural guarantee against deprivation of life, liberty, and property, but likewise protects substantive aspects of these interests. Kelley v. Johnson, 425 U.S. at 244, 96 S.Ct. 1440. If this were not true, a government employer could unilaterally change its policies or regulations at will, apply them in a discriminatory fashion and then provide nonrenewal as the penalty for failure to comply. The adequate notice and fair hearing required by procedural due process would have little meaning if, upon conclusion of the hearing, the government were free to ignore settled rules and understandings, disregard facts or otherwise act in an arbitrary and capricious manner. Whether the lack of a rational basis is found in the board's classification and disparate treatment or in its arbitrary departure from practices upon which plaintiff justifiably could rely, we are convinced that the action of the board violated Fourteenth Amendment notions of fairness embodied in the Due Process Clause generally and the Equal Protection Clause particularly.
 
 
 29
 We therefore reverse and remand to the district court for a determination of the appropriate remedy.
 
 
 30
 McWILLIAMS, J., concurs in the result.
 
 
 
 [1]
 Martin testified at trial that the Board's order that she earn five credits by the coming April amounted to an impossible burden: "I was coaching High School and I was gone two and sometimes four nights a week and I thought that was enough for my marriage to stand, at that particular time." Record, vol. 4, at 37
 
 
 [2]
 Martin v. Harrah Independent School Dist., No. CJ 74 1945 (Dist. Ct., Oklahoma County, July 15, 1974). The court's order of reinstatement was based on its finding that the nonrenewal "was done without authority of law and in violation of (plaintiff's) rights to due process under the law." Id
 
 
 [3]
 Martin v. Harrah Independent School Dist., No. 47,689, slip op. at 7-8 (Okl.1975):
 (T)he regulation contains only one penalty provision, that "Salary increments will be denied for any teacher who does not meet this requirement." This was the penalty in effect at the time the parties entered into their contract and the only penalty approved by the board in their rules and regulations throughout the adjudication of this case. . . .
 . . . (T)he question of whether the board imposed a proper penalty by virtue of its own lawfully enacted rules is controlling.
 A board should take cognizance of its rules in making decisions, Falvey v. Simms Oil Co., Tex.Civ.App., 92 S.W.2d 292 (1936); the board should not merely recognize that violation of the rule by an employee exists and not give recognition to the remainder of the rule dealing with the penalty for such a violation. Thus the rules that the board passes binds them to compliance, People v. Gregory, 337 Ill.App. 661, 86 N.E.2d 434 (1949). Appellee has a right to rely on these rules in considering her alternatives.
 Appellee here is a tenured teacher which under 70 O.S.1971 § 6-122 entitles her to have her contract renewed unless proof of one of the statutorily enumerated causes for nonrenewal is shown. Here the board by its own rules provided that the penalty for noncompliance with the regulation would not be dismissal but merely monetary loss. The board should be held to its specification of penalty.
 
 
 [4]
 Jurisdiction properly was based on 28 U.S.C. §§ 1331 and 1343. Plaintiff also alleged a cause of action under 42 U.S.C. § 1343 and asserted jurisdiction under 28 U.S.C. § 1332. The former section does not exist, and, since all parties were residents of Oklahoma, the latter assertion of diversity jurisdiction is groundless
 
 
 [5]
 This sliding-scale approach, initially articulated in connection with an equal protection analysis in Dandridge v. Williams, 397 U.S. 471, 520-21, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970) (Marshall, J., dissenting), was more fully developed in San Antonio Independent School Dist. v. Rodriguez, 411 U.S. 1, 97-110, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (Marshall, J., dissenting). Support for this approach is also found in Jiminez v. Weinberger, 417 U.S. 628, 94 S.Ct. 2496, 41 L.Ed.2d 363 (1974) (Burger, C. J., majority); Vlandis v. Kline, 412 U.S. 441, 458-59, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973) (White, J., concurring); Weber v. Aetna Cas. & Surety Co., 406 U.S. 164, 172-75, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972) (Powell, J., majority); Poe v. Ullman, 367 U.S. 497, 539-49, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting). In USDA v. Murry, 413 U.S. 508, 519, 93 S.Ct. 2832, 2838, 37 L.Ed.2d 767 (1973), the author of the sliding-scale approach correctly observed that the irrebuttable presumption approach "combines elements traditionally invoked in what are usually treated as distinct classes of cases, involving due process and equal protection. But the elements of fairness should not be so rigidly cabined." We agree that "(t)here is no reason . . . to categorize inflexibly the rudiments of fairness." Id
 
 
 [6]
 Plaintiff also asserted deprivation of a constitutionally protected liberty interest. Having found a protected property interest, the district court did not address this issue. Since the resolution of this question affects calculation of any damages, we hold that plaintiff's loss does not meet the test for a protected liberty interest. See Weathers v. West Yuma County School Dist., 530 F.2d at 1338-40